**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**_____DIVISION**

**Case No.:  1:25-cv-22386**

**ADRIANUS VAN WESENBEECK,**
**INDIVIDUALLY AND AS A**
**REPRESENTATIVE OF THE ESTATE**
**OF ELLY ADRIANA JANSSEN**

       **Plaintiff,**

**vs.**                                      **JURY TRIAL DEMANDED**

**NETFLIX, INC.,**

**NETFLIX CPX, LLC**

**NETFLIX MEDIA, LLC**

**NETFLIX PRODUCTIONS, LLC**

       Defendants.

_____/

**<u>COMPLAINT</u>**

COMES NOW, Plaintiff[1], **ADRIANUS VAN WESENBEECK, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE ESTATE OF ELLY ADRIANA JANSSEN** by and through undersigned counsel, hereby files this Complaint for copyright infringement, defamation, intentional infliction of emotional distress, and violations of Plaintiffs' right of publicity, arising out of the brutal lies Defendants told about him in: (1) Season 1 of Undercover (2019), (herein referred to as "Season 1"); (2)  Season 2 of Undercover (2020), (herein referred

---

[1] ADRIANUS VAN WESENBEECK is the putative personal representative of the Estate of ELLY ADRIANA JANSSEN and is in the process of being duly appointed as the personal representative of said Estate.

to as "Season 2"); (3) Season 3 of Undercover (2021), (herein referred to as "Season 3")[2]; (4) Ferry Movie 1 (2021), (herein referred to as "Movie 1"); (5) Ferry: the Series (2023), (herein referred to as "Ferry Series" or "Ferry: the Series"); and (6) Ferry 2: the Movie (2024), (herein referred to as "Ferry Movie 2" or "Movie 2") distributed, streamed and released by NETFLIX against Defendants, **NETFLIX, INC.,[3] NETFLIX CPX, LLC,[4] NETFLIX MEDIA, LLC,[5] and NETFLIX PRODUCTIONS, LLC[6]** (collectively "Defendant," "The Defendant", or "NETFLIX.")  and in support thereof states:

## PARTIES, JURISDICTION, AND VENUE

1.     This is an action for copyright infringement, defamation, intentional infliction of emotional distress, and violations of Plaintiffs' right of publicity, and asks for damages and injunctive relief against the Defendants, prohibiting the publication of defamatory, distressing, and copyrighted material.

2.     In part, this is an action for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. § 101 et seq., 17 U.S.C. § 101, 17 U.S.C. § 301(a) and 17 U.S.C. §1338 (a) and

---

[2] Season 1, Season 2, and Season 3 are collectively referred to as "Undercover" or "Series 1."

[3] https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=NETFLIX%20F020000062790&aggregateId=forp-f02000006279-0e77442d-c314-4e7a-8079-8c49c53379fc&searchTerm=netflix&listNameOrder=NETFLIX%20F020000062790

[4] https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=NETFLIXCPX%20M230000037290&aggregateId=forl-m23000003729-f3956b6f-4989-4822-b92b-4160bf423e6f&searchTerm=netflix&listNameOrder=NETFLIX%20F020000062790

[5] https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=NETFLIXMEDIA%20M220000066330&aggregateId=forl-m22000006633-d29bf959-badf-474f-bf55-9b186fe2a3de&searchTerm=netflix&listNameOrder=NETFLIX%20F020000062790

[6] https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=NETFLIXPRODUCTIONS%20M220000124100&aggregateId=forl-m22000012410-954bd5b6-93a4-4a06-b81e-5cf72bec8be2&searchTerm=netflix&listNameOrder=NETFLIX%20F020000062790

(b), for violation of the Lanham Act, 15 U.S.C. §§ 1114, 1117 and 1125. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

3.     This Court has personal jurisdiction over NETFLIX. Upon information and belief NETFLIX systematically does business in the State of Florida, including knowingly and intentionally providing interactive services to persons located in Florida, and transacting with and contracting to supply services to persons in Florida in connection with the matters giving rise to this suit. NETFLIX offers to and does provide services to persons in Florida. NETFLIX has committed infringing acts within Southern Florida,

4.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1400(a).

5.     This Court has personal jurisdiction over Netflix pursuant to Florida's long-arm statute, Fla. Stat. § 48.193(1)-(2) and under the Due Process Clause because:

> a) Netflix advertised and promoted Season 1, Season 2, Season 3, Ferry Series, Movie 1, and Movie 2 to Florida residents by airing trailers and, as intended, such advertisements were viewed by Florida residents;
>
> b) Netflix pays taxes in the State of Florida;[7]
>
> c) Netflix published the defamatory Series and Movies on its website (and through its apps, which are available on mobile devices and various streaming platforms), and the episodes were accessible in Florida and accessed in Florida by Florida residents, constituting the commission of tortious acts within Florida;
>
> d) Netflix had offices in Florida until at least 2019;[8]
>
> e) Netflix is engaged in substantial and not isolated activity within Florida, including sending its employees and contractors to Florida for work-related

---

[7] *See* General Taxes, Fla. Dep't of Revenue, https://www.stateofflorida.com/taxes/ (Ex. 1)
[8] *See* Netflix, Inc. Foreign Profit Corp. Details for Fla. (Ex. 2)

purposes, filming in Florida, conducting information gathering in Florida, and producing shows featuring Florida and Florida residents;[9]

f) Netflix regularly solicits business from Florida residents, regularly enters into contracts with Florida residents, and derives revenue from Florida residents.

6.      Venue is proper under U.S.C. § 1391 (b), (c), and (d) because, as set forth above, the torts occurred in Palm Beach, County Florida and the harm was felt in Miami-Dade County.

7.      This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the Defendant is a business entity doing business under the laws of Florida and the Plaintiff is a citizen of a foreign state who has not been lawfully admitted for permanent residence in the United States, and the amount in controversy exceeds $75,000.00 exclusive of attorney's fees and costs.

9.      At all times material hereto, Plaintiff Wesenbeeck, ADRIANUS VAN WESENBEECK ("Plaintiff Wesenbeeck"), was and is a resident of a foreign country (The Netherlands).

10.     Plaintiff Wesenbeeck was married to ELLY ADRIANA JANSSEN ("Decedent"), a resident of the Netherlands.

11.     Decedent died August 11, 2015.

12.     At all times material hereto, Defendant, NETFLIX, was and is a Foreign Corporation authorized to do business in the State of Florida, including Miami-Dade County.

13.     Venue is proper in this judicial district because NETFLIX, was and is a corporation, or a subsidiary of a corporation registered in Florida and conducting business in the State of Florida, including Miami-Dade County, and distributed the defamatory material at issue in Miami-Dade County.

---

[9] Examples of Netflix's activities in Florida are included within Ex. 3.

14.     Additionally, venue is proper in this judicial district because Defendant NETFLIX conducts substantial, continuous, and systematic business in the State of Florida and in this judicial district.

15.     Plaintiff Wesenbeeck, who is domiciled in and is a citizen of the Netherlands, and has been described as "Europe's biggest drug lord of The Netherlands, Belgium, and Luxembourg," according to Belgian prosecutors in 2010; was best known to the general public as Ferry Bouman from : Season 1, Season 2, Season 3, Ferry Series, Movie 1, and Movie 2 .

16.     Defendant NETFLIX is a producer and distributor of content with over 280 million paid subscribers and a market cap of $283 billion.

17.     NETFLIX owns the NETFLIX streaming platform that streams Season 1, Season 2, Season 3, Ferry Series, Movie 1, and Movie 2 .

18.      "[NETFLIX] acquires, licenses, distributes and produces content, including original programming, in order to offer our members unlimited viewing of video entertainment." NETFLIX,  Jan. 26, 2024 10-K Report at p. 28 (Netflix 10-K).

19.     At all times material hereto, Defendant NETFLIX, published and continues to publish, distribute, advertise, promote, market, and/or endorse Season 1, Season 2, Season 3, Ferry the Series, Movie 1, and Movie 2, and associated promotional materials in Miami-Dade County.

20.     Defendant, NETFLIX was and is a Foreign Corporation authorized to do business in the State of Florida, including Miami-Dade County.

## FACTUAL ALLEGATIONS

21.     Defendant NETFLIX, is a Delaware corporation with a headquarters at 121 Albright Way, Los Gatos, California, 95032. NETFLIX is a producer and distributor of content with over 280 million paid subscribers and a market cap of $283 billion.

22.     NETFLIX owns and operates the Netflix streaming platform, a service that streams (broadcasts and publishes) Season 1, Season 2, Season 3, Ferry the Series, Movie 1, and Movie 2.

23.     "[Netflix] acquires, licenses, and produces content, including original programming, in order to offer our members unlimited viewing of video entertainment." NETFLIX,  Jan. 26, 2024, 10-K Report at p. 28 (Netflix 10-K).

24.     As noted in NETFLIX 's most recent 10-K filing with the SEC:

"[W]e must continually add new members to replace canceled memberships and to grow our business beyond our current membership base. . . Our ability to continue to attract and retain our [subscribers] will depend in part on our ability to consistently provide our members in countries around the globe with compelling content choices that keep our [subscribers] engaged with our service, effectively drive conversation around our content and service, as well as provide a quality experience for choosing and enjoying TV series, films, and games. . . If we do not grow as expected . . . operations may be adversely impacted. If we are unable to successfully compete with current and new competitors in providing compelling content, retaining our existing members and attracting new members, our business will be adversely affected."  Netflix 10-K at p. 4 (emphasis added).

25.    NETFLIX, earns revenue not only through paid subscribers (called "members") but "also earns revenue from advertisements presented on its streaming service, consumer products, and other various sources." Netflix 10-K at p. 46.

26.    NETFLIX reports average revenue per member.

27.    Defendants created and/or distributed multiple highly profitable series and movies that depicted the Plaintiff.

28.    "UNDERCOVER," A NETFLIX SERIES (TV Series 2019) ("Season 1") was distributed, streamed, and released by NETFLIX in the United States, specifically Miami-Dade, Florida, whereby defamatory statements about the Plaintiff, which were and continue to be published and distributed against his person.



29.    On or about 5/3/2019 UNDERCOVER was renewed for a second season, which premiered on 11/8/2020, followed by a third season that premiered on 11/21/21, which were continued to be distributed, streamed, and released by NETFLIX in the United States, specifically Miami-Dade, Florida, whereby defamatory statements about the Plaintiff were/are, published and distributed against his person. (See Below, Screenshot from "Undercover").

30.     FERRY: THE MOVIE ("Movie 1") was distributed, streamed, and/or released by NETFLIX in the United States, specifically Miami-Dade, Florida, on or about 5/14/2021, whereby defamatory statements about the Plaintiff were/are  published and distributed against his person. (See below, Screenshot From Ferry: The Movie).



31.     "Movie 1" republished defamatory statements regarding the Plaintiff that first appeared in Season ).

32.     FERRY: THE SERIES (TV Series 2023) was distributed, streamed, and released by NETFLIX on or about 11/3/2023. (See below, Screenshot From Ferry: The Series).



33.     "Ferry: the Series" republished defamatory statements regarding the Plaintiff, Adrianus

Van Wesenbeeck that first appeared in both "Undercover" the series and "Ferry" the movie.

34.     Defendant NETFLIX, published, released, distributed (1) Season 1 of Undercover

(2019); (2)   Season 2 of Undercover, (2020); (3) Season 3 of Undercover, (2021); (4) Ferry

Movie 1, (2021); (5) Ferry, the Series (2023); and (6) Ferry, the Movie 2, (2024) which are

internationally understood to be based on Plaintiff, Adrianus Van Wesenbeeck's life story.

35.     NETFLIX knowingly capitalized on Plaintiff, allowing public perception and widespread

media coverage to confirm what was plainly evident — that the character *Ferry Bouman* is

unmistakably based on Plaintiff, Adrianus Van Wesenbeeck's life story.

36.     This is not speculative, it has been publicly acknowledged and repeatedly confirmed by

external reporting, including *The Cinemaholic*, which stated:

> *"Undercover is based on a true story. The story is inspired by the arrest of Janus van W,*
>
> *a big-time drug lord from the Netherlands. The character of Ferry Bouman… is also*
>
> *loosely based on him"*(See also, *infra*, screenshots at 74, 81, and 136).

37.     Additionally, actor Frank Lammers, who portrays Ferry Bouman, has publicly admitted

in a direct conversation with Plaintiff in front of several journalists—that the character is based

on no other than Plaintiff: Adrianus Van Wesenbeeck.

38.     Thus, Defendant NETFLIX created, published, screened, distributed, streamed, and/or

released several audiovisual works based on  Plaintiff, Adrianus Van Wesenbeeck*,* including:

- *UNDERCOVER* (TV Series 2019) ("Season 1, Season 2, and Season 3")

- *FERRY: THE MOVIE* (2021) ("Movie 1")

- *FERRY: THE SERIES* (TV Series 2023) ("Ferry, the Series")

- *FERRY 2: THE MOVIE* (2024) ("Movie 2")

39.     Even though Defendant carefully avoided any explicit acknowledgment, these works have been overwhelmingly understood by the public to portray the life of the Plaintiff. This deliberate and misleading presentation has caused significant harm by blurring the line between fiction and reality and falsely associating the Plaintiff with the character of *Ferry Bouman*.

40.     As a result, the public perceives the entire narrative as factual and true. This deliberate conflation of fiction with reality has caused widespread harm, as the character *Ferry Bouman* is widely understood to be based on Plaintiff's life story.

41.     Moreover, in addition to the defamatory statements made in  *Undercover*; Ferry *Movie 1,* and Ferry the *Series* republished defamatory statements regarding Plaintiff, falsely depicting him as a heinous murderer and human trafficker over and over again, for a number of years.

42.     Further, Plaintiff is the author and owner of the literary work entitled *Drugsbaron: HET VERHAAL VAN DE ECHTE FERRY BOUMAN*[10] (the "Copyrighted Material" or "*Drugsbaron*"), first published in the Netherlands on April 17, 2024, achieving substantial public recognition and commercial success.

43.     Plaintiff is the exclusive owner of all rights, title, and interest in and to the Copyrighted Material, including all rights in the United States under the United States Copyright Act.

44.     On April 22, 2025, Plaintiff formally registered the Copyrighted Material with the United States Copyright Office, as evidenced by Registration No. TX 9-493-699.

45.     Following the release of the Copyrighted Material on or about April 17th, 2024, NETFLIX distributed and released *FERRY 2: THE MOVIE* ("Movie 2") on or about December 20, 2024, via its streaming platform in the United States and internationally. (See below, Screenshot Ferry 2).

---

[10]In English: Druglord, the Story of the Real Ferry Bouman.



46.     *Movie 2* unlawfully appropriates substantial, protectable elements from Plaintiff's Copyrighted Material, including unique narrative structure, characters, specific factual details, and scenes original to the Copyrighted Material that could not have been independently created without access to Plaintiff's work.

47.     NETFLIX neither sought nor obtained Plaintiff's permission to use, reproduce, adapt, distribute, or otherwise exploit any portion of the Copyrighted Material and, upon information and belief, had access to and knowledge of the work prior to creating *Movie 2*.

48.     The similarities between *Movie 2* and Plaintiff's Copyrighted Material are so substantial and specific that they cannot be explained by coincidence or common sources but reflect direct copying of original, protectable elements.

49.     Separately, Defendant NETFLIX commissioned or created a promotional song for *Movie 2*, titled *"King of the Camping"*, containing lyrics that reference Plaintiff and his late wife, Lydia, in a derogatory and defaming manner.

50.     NETFLIX never obtained consent to use Plaintiff's nor his late wife, Lydia's likeness, identity, or personal history to advertise, promote, market, or endorse any of its works or promotional materials, including the promotional song .

51.     "Ik ben de king, king, king van de camping. Ik ben de king king king, er is bier voor iedereen. Ik ben de king, king, king van de camping. Maar wat is een koning zonder koningin?"

Meaning: I am the king, king, king of the campsite. I'm the king king king, there's beer for everyone. I am the king, king, king of the campsite. But what is a king without a queen?

52.     The derogatory sentence in the Defendant's promotional song is about Plaintiff Adrianus Van Wesenbeeck and his wife, Lydia Van Wesenbeeck, who died in 2015 of cancer.

53.     As shown below, the song was quickly recognized by commenters on NETFLIX's own Facebook page as being about Adrianus and Lydia Van Wesenbeeck.





54.    NETFLIX's official account made light of the subject of the song, namely the death of Lydia.



55. Defendant never sought permission nor authority to use Adrianus Van. Wesenbeek's personality  image, likeness, personality and/or identity to advertise, promote, market, or endorse Season 1, Season 2, Season 3, Ferry: the Series, Movie 1, and Movie 2, to include The Promotional Song.

56. Defendant never sought permission nor authority to use Plaintiff, Adrianus Van. Wesenbeek nor Wesenbeeck's deceased spouse Elly Adriana Janssen's  image, likeness, personality and/or identity to advertise, promote, market, or endorse Season 1, Season 2, and Season 3, Ferry: the Series, Movie 1, and Movie 2, to include The Promotional Song.

57. As evidence that  (1) Season 1 of Undercover (2019); (2)  Season 2 of Undercover, (2020); (3) Season 3 of Undercover, (2021); (4) Ferry Movie 1, (2021); (5) Ferry, the Series (2023); and (6) Ferry, the Movie 2, (2024), distributed, streamed, and released by NETFLIX are based on Plaintiff's life story, we have enclosed and incorporate Exhibits A through F, which show similarities between Ferry Bouman and Plaintiff's life; there are actually over two-hundred

(200).[11] The similarities continue through the different works, as the series and movies present Mr. Wesenbeeck's life. As examples, the similarities include, but are not limited to:

i. Both Adrianus Van Wesenbeeck and Ferry Bouman, portrayed by actor Frank Lammers, are from Southeast Brabant;

ii. Both Adrianus Van Wesenbeeck and Ferry Bouman operate in the international drug trade;

iii. Both Adrianus Van Wesenbeeck and Ferry Bouman use identical language, and not only because of the Brabant dialect, but also sometimes even the same words and expressions;

iv. Both Adrianus Van Wesenbeeck and Ferry Bouman have to deal with a male and female undercover agent who tries to infiltrate the organization by renting a house on the "camping site" or "campsite" (in American terms, a trailer park). *See*, Screenshot from Undercover, Episode 3, below.



---

[11] Exhibits A-E show screenshots of the Movies and shows, with each exhibit showing similarities between one season or movie and Plaintiff's life. Exhibit F does the same, but also shows similarities between the Copyrighted book "Drugsbaron" and the movie "Ferry 2." In Exhibit F, similarities with the Plaintiff's real life are shown in black, above the relevant screenshots, while similarities from the book are shown in red below the screenshots.

v.      Both Adrianus Van Wesenbeeck and Ferry Bouman have a silent right-hand man, who in his every behavior resembles Adrianus' real right-hand man;

vi.      Both Adrianus Van Wesenbeeck and Ferry Bouman run their organization from a campsite (See Screenshot from Undercover Episode 1, below);



vii.      The Undercover agents take a substantial amount of time penetrate Ferry Bouman's entourage, as in real life where it took years to get to know Adrianus Van Wesenbeeck;

iix.      The criminal organization works with code names and has a strict telephone policy; (See Screenshot from Undercover, Episode 2, below).



ix. The arrest in the party tent in the series Undercover closely resembles the arrest of Adrianus Van Wesenbeeck in a party tent. (See Screenshots from Undercover, Season 1, Episode 10, below).





58.     Again, this list is not exhaustive, as again, there are more than two hundred (200) similarities between the real-life Adrianus and the "fictional" Ferry *(See* Exhibits A-F).

59.     These similarities are unique and specific, continuing consistently across *Season 1, Season 2, Season 3, Ferry the Series, Movie 1*, and *Movie 2*, and cannot reasonably be attributed to coincidence.

60.     In fact, actor Frank Lammers, who portrays *Ferry Bouman*, admitted directly to Plaintiff that the character is based on Plaintiff, eliminating the possibility that the portrayal concerns any other individual.

61.     Since the release of *Undercover* in 2019, members of the public across the world have consistently identified Plaintiff as *Ferry Bouman* through online forums, articles, and social media.

62.     NETFLIX's works falsely portray Plaintiff as a heinous serial murderer and human trafficker — serious defamatory statements given that Plaintiff's actual criminal history consists only of nonviolent drug-related offenses.

63.     NETFLIX's series and films depict *Ferry Bouman* committing numerous murders on-screen, falsely attributed to Plaintiff.

18

64.     NETFLIX series and films falsely depict *Ferry Bouman* as a police informant, which has led to real-life threats on Plaintiff's life.

65.     *Movie 2*, in particular, introduces defamatory portrayals and narrative details that first appeared in Plaintiff's Copyrighted Material, further confirming NETFLIX's access to and use of Plaintiff's work.

66.     *Season 1, Season 2,  Season 3, Ferry the Series, Movie 1*, and *Movie 2*, together with the degrading promotional song, falsely state Plaintiff committed and/or continues to commit serious crimes, including multiple murders, kidnapping, assault, and human trafficking.

67.     These false statements have caused and continue to cause severe emotional, reputational, and financial harm to Plaintiff, including loss of income, harm to reputation and goodwill, and emotional distress manifesting as anxiety, depression, and paranoia.

68.     NETFLIX's global promotion and distribution of these defamatory statements, without Plaintiff's consent, constitute a knowing, willful, and reckless disregard for Plaintiff's rights.

69.     The similarities between the NETFLIX works and Plaintiff's Copyrighted Material, particularly elements introduced for the first time in *Movie 2*, including distinctive narrative devices (such as the use of a Recreational Vehicle (RV) in Spain and Santa Claus pranks at a campsite), are so idiosyncratic that they satisfy the "striking similarity" standard under U.S. Eleventh Circuit law.

70.     It is implausible that there is any male person from Southeast Brabant, who operates in the international drug trade from a camping site or trailer park where undercover agents infiltrate a drug kingpin's operation in Lommel, a town of 38,000 people in Limburg, a Flemish province bordering the Netherlands, and who bears an uncanny resemblance to '*Ferry Bouman*,' other than Adrianus Van Wesenbeeck.

71.     Moreover, actor Frank Lammers, who portrays *Ferry Bouman*, has admitted in a direct conversation with Adrianus Van Wesenbeeck that the character is based on Adrianus Van Wesenbeeck, ultimately eliminating the possibility that the subject statements are about someone else.

72.     The character of *Ferry Bouman* is so associated with Plaintiff that, as recently as 2025, a third-party company, following normal industry practice, contacted Plaintiff to request licensing rights for a new audiobook regarding the Plaintiff's book, *Drugsbaron*, based on Plaintiff's life. The proposed concept for the audiobook involved Mr. Lammers, who portrays Plaintiff in six ("6") different Netflix originals since 2019, narrating the story in character, speaking as though he were the Plaintiff.

73.     NETFLIX's unauthorized use of Plaintiff's story, identity, likeness, and copyrighted materials for commercial gain has caused and continues to cause substantial harm to Plaintiff, justifying an award of damages and injunctive relief.

74.     Since the release of the television series Undercover back in 2019, members of the public have identified Adrianus Van Wesenbeeck as "Ferry Bouman." showing popular Internet forums users identifying and discussing Adrianus Van Wesenbeeck as the real "Ferry Bouman."



Undercover is streaming on Netflix now (Image: NETFLIX)

## What is Undercover on Netflix about?

Fans of Narcos and Breaking Bad will want to catch Undercover on Netflix.

The series follows two undercover agents who pose as a couple, renting a villa in the same location as a notorious drug lord.

The two agents have been tasked with exposing Bouman's empire.

However, Bouman has a mole within the police force, so things do not quite go as expected for the two agents.



Undercover is streaming on Netflix now (Image: NETFLIX)

Bouman is a fictional character based on Janus van W from Eindhoven, The Netherlands.

Janus van. W lived in a chalet in Lommel, Belgium and was caught by two undercover agents in 2009.

He was sentenced to 14 years in prison for drug smuggling.

But he was released early in 2015 and his current whereabouts are unknown.

The official synopsis reads: "One of the largest ecstasy producers in the world, Ferry Bouman, lives a charmed life in his campground villa on the Dutch-Belgian border.

"But things start to change when two undercover agents move into his territory, attempt to infiltrate Bouman's life and shut down his network."

*Undercover is streaming on Netflix now*                    12

---

[12] see:
https://www.express.co.uk/showbiz/tv-radio/1121379/Undercover-Netflix-location-series-Where-is-Undercover-filmed-set-Belgium-Netherlands



---

[13] See:
https://www.skoften.net/skft/3701441/dit-is-de-echte-crimineel-waarop-ferry-bouman-uit-de-serie-undercover-is-gebaseerd (in Dutch, screenshot autotranslated)



**AD.nl** ✓ · **Follow**
Apr 19 · 🌐

Op hem is Ferry Bouman uit de serie Undercover gebaseerd 👀

> Ferry Bouman from the series Undercover is based on him 👀
> ⚙ Rate this translation



ad.nl
**Hij verdiende miljoenen met hasj en pillen: Janus van Wesenbeeck (62) stapt uit de schaduw**



👍❤️😆 85                                        41 comments   5 shares



👍 Like          💬 Comment          🔗 Copy          ↪ Share

---

**De Telegraaf** ✓ · **Follow**
Jun 23 · 🌐

De serie Undercover op Netflix met de door Frank Lammers gespeelde Ferry Bouman was een grote hit. Het personage en de reeks zijn gebaseerd op een... **See more**

> The series Undercover on Netflix with Ferry Bouman played by Frank Lammers was a big hit. The character and the series are based on one of Brabant's biggest drug criminals, Janus van Wesenbeeck (62).
> ⚙ Rate this translation



telegraaf.nl
**Janus is 'de echte Ferry Bouman' en deed zelden zijn mond open, tot nu: 'Ik werd als een schietende gek ne...**

👍 39                                             21 comments   4 shares

👍 Like          💬 Comment          🔗 Copy          ↪ Share

23



75. The identification of Adrianus Van Wesenbeeck as 'Ferry Bouman' in six ("6") different Netflix original global series and movies is easy; with the exception of the violent crimes he commits on screen, Ferry Bouman is nearly identical to Adrianus Van Wesenbeeck.

76.  (1) Season 1 of Undercover (2019); (2)  Season 2 of Undercover, (2020); (3) Season 3 of Undercover, (2021); (4) Ferry Movie 1, (2021); (5) Ferry, the Series (2023); and (6) Ferry, the Movie 2, (2024) present Adrianus Van Wesenbeeck as a serial murderer and human trafficker, when Mr. Van Wesenbeeck is not a murderer or human trafficker, and has never been accused of or convicted of such heinous crimes.

77. More specifically, Defendant used the character of "Ferry Bouman" to publish false statements about Plaintiff Wesenbeeck.

78. Particularly, Defendant falsely stated and published that Plaintiff is a murderer, a serial murderer, and a human trafficker, when in fact Plaintiff Wesenbeeck has never been charged with or convicted of murder, serial murder, or human trafficking.

79.     Plaintiff's criminal record reflects charges and convictions solely for the non-violent offenses of drug trafficking, participation in an international criminal organization, and money laundering.

80.     Again, none of these offenses rise to the level of heinous crimes such as human trafficking, serial murder, or murder. Contrary to the false and malicious publications that portray Plaintiff Wesenbeck as having committed such acts to a global audience, his criminal record reflects no such charges or convictions.

81.     Among the murders, crimes, and false and defamatory statements shown on screen by the thinly veiled Adrianus Van Wesenbeeck ("Ferry") or on Ferry's orders:

i.      A gang member is stabbed and shot dead by Ferry (**Undercover, Season 1 Episode 1 at**: 36:55 + 37:03).



ii.     The man who helps bury the above-mentioned gang member is stabbed and shot dead on Ferry's orders (**Undercover, Season 1 Episode 1 at**: 38:52).



iii.    In "Ferry: the Series," Season 1 Episode 8, Ferry and an accomplice take an alleged traitor out into the woods and murder him. (23:35).



iv.    In **Undercover Season 2** Ferry Bouman is working together with the police officer, the former undercover agent from season 1. According to the Plaintiff, this has led to threats against his life.





v.   In **Undercover Season 3**, EP06: Ferry, in the presence of the undercover agent, hits an innocent man on the head with bottle and kicks several times while victim is on the ground.



vi.     In Episode 7 Lars, on Ferry's orders, must flee with the car full of ecstasy pills from the
undercover agent with whom Ferry is working. Ferry is only slightly injured, but Lars is
severely injured.





vii.      In episode 7: Ferry again works as a police informer.



iix       In Episode 8, Ferry holds the undercover agent at gunpoint. Threatens him, kicks and

          punches him and leaves him bleeding.





ix.   **In "Ferry the Movie," (Movie 1)** Ferry murders someone by placing a pillow over his

head and shooting him (4:10).



v.   Ferry later shoots someone dead in a quarry (*Id*. at 41:20).



vi.   Later in the film, Ferry breaks into a man's house and kills him. dead (*Id*. at 1:02:21).



vii.    Ferry then murders his boss. (*Id*. at 1:36:00).



iix.    Then Ferry chases down and murders another colleague (1:37:33).



ix.    In **Ferry Movie 2,** Ferry orders an assasination.





x.      Other murders from previous movies and seasons are also shown again.





xi.     Ferry kills a man telling a relative about a murder he ordered.



xii.    Ferry then goes on a killing spree, he kills one person outside of a mobile home and a another person inside of the same mobile home. F







xiii.    He shoots another person soon after.



xiv.    Then he shoots someone else.



xv. He kills the antagonist of the film last.





82.    Displayed above are only a few instances of the horrific, heinous, and defamatory acts committed by *"Ferry Bouman"* in NETFLIX's television series and movies, which are presented, published, promoted, and screened daily by NETFLIX to their millions of subscribers worldwide.

83.    Undercover Season 1, Season 2,  and Season 3; Ferry Movie 1; Ferry: the Series; and Ferry Movie 2, state that Plaintiff Wesenbeeck commits the following crimes: multiple murders; kidnapping; assault; battery; threats; and human trafficking.[14]

---

[14]  See "Villains Wiki" a database of film villains:
https://villains.fandom.com/wiki/Ferry_Bouman



84.    In fact, although Plaintiff Wesenbeeck was only convicted of nonviolent crimes such as drug trafficking, Plaintiff Wesenbeeck has never committed nor been convicted of any violent crimes shown above.

85.    As a result of continuously being identified as '*Ferry Bouman*' after NETFLIX's release of *Undercover Season 1, Season 2,  Season 3; Ferry: the Series, Ferry Movie 1, and Ferry Movie*

2 Adrianus Van Wesenbeeck has and continues to suffer severe emotional distress, which has been manifested by objective symptomatology.

86.     Adrianus Van Wesenbeeck continues to experience anxiety, extreme stress, nightmares, panic attacks, paranoia, shame, depression, nervousness, and abdominal pain directly caused by the lies told throughout the world about him by NETFLIX's release of Undercover Season 1, Season 2,  Season 3; Ferry: the Series, Ferry Movie 1, and Ferry Movie 2.

87.      As stated in NETFLIX's most recent 10-K filed with the SEC:

> If we do not grow as expected . . . operations may be adversely impacted. If we are unable to successfully compete with current and new competitors in providing compelling content, retaining our existing members, and attracting new members, our business will be adversely affected. *Netflix 10-K* at p. 4.[15]

88.     To ensure that NETFLIX continued to meet its shareholders' "growth expectations" and to satisfy its desperate need for "compelling content", NETFLIX ruthlessly defamed Adrianus Van Wesenbeeck for profit.

89.     Plaintiff Wesenbeeck has been severely damaged by Defendant's actions. The defamatory statements by Defendant caused emotional, psychological, social, reputational, and monetary harm to Plaintiff Wesenbeeck, including *inter alia*, causing Plaintiff Wesenbeeck to even be forced out of his home by the government like a pariah due to the reputational damage he suffered.

### I.      COUNT ONE: COPYRIGHT INFRINGEMENT.

90.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

91.     Plaintiff is the owner and author of the literary work entitled *Drugsbaron: HET VERHAAL VAN DE ECHTE FERRY BOUMAN* (the "Copyrighted Material"), created on or

---

[15] https://www.sec.gov/Archives/edgar/data/1065280/000106528024000030/nflx-20231231.htm

about 3/27/2024, duly copyrighted in a Berne Convention signatory country securing international protection, and duly registered with the United States Copyright Office on 4/22/2025 (Reg. No. TX 9-493-699).

92.     To establish a prima facie case of copyright infringement, a plaintiff must show:

>       (a) ownership of a valid copyright, and

>       (b) copying of constituent elements of the works that are original. See *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

93.     Copying requires both factual and legal copying. *Compulife Software, Inc. v. Newman*, 959 F.3d 1288, 1301–02 (11th Cir. 2020).

94.     Factual copying may be established through direct evidence or, absent such evidence, by indirect evidence demonstrating:

>       (a)   The defendant had access to the copyrighted work; and

>       (b) there are substantial or striking similarities between the protected work and the infringing work. See *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1554 (11th Cir. 1996).

95.     Given the uniqueness and complexity of the Copyrighted Material's story, characters, plot, themes, and narrative structure, the substantial and specific similarities to *Ferry 2 the Movie* (12/20/2024) - which was released after the creation of the Plaintiff's Copyrighted Material (3/27/2024) - constitute "striking similarities" within the meaning of the law.

96.     Defendants, without authorization, license, or consent, copied, reproduced, publicly performed, displayed, and distributed substantial and protectable elements of Plaintiff's

Copyrighted Material by creating and distributing *Ferry Movie 2*, a film incorporating original and significant elements of the Copyrighted Material.

97.     NETFLIX had reasonable access to the Copyrighted Material prior to the creation and release of *Ferry Movie 2*.

98.     NETFLIX employees, contractors, or affiliates viewed, were made aware of or otherwise had access to the Copyrighted Material during the relevant time period.

99.     Without authorization from Plaintiffs, Defendants reproduced, distributed, and/or publicly performed the Copyrighted Material by creating and distributing a film recording to their millions of subscribers that copied and embodied Plaintiff's protected Copyrighted Material.

100.    Such actions constitute a violation of Plaintiffs' exclusive rights under 17 U.S.C. § 106.

101.    Defendant's actions were willful, deliberate, and in conscious disregard of Plaintiffs' rights, as Defendants knew or should have known that the Copyrighted Material was protected by copyright.

102.    Plaintiff contends that the public availability of the work, coupled with its success and direct relevance to the subject matter portrayed in *Movie 2*, makes it reasonably probable that NETFLIX had access to the Copyrighted Material.

103.    Moreover, Plaintiff asserts specific and sufficient evidence to refute any testimony or claim by NETFLIX that it lacked knowledge of the Copyrighted Material prior to the creation and release of *Movie 2*. This includes, *inter alia*, factual overlaps between the Copyrighted Material and *Movie 2* that are too particular and distinctive to have arisen coincidentally.

*104.    Movie 2* plays out roughly as follows: It begins after Ferry is released from a long prison sentence. It begins with him living in an RV in Spain, speaking Spanish, and dressing up as Santa

Claus to play jokes on the children in the RV park. He reconnects with his niece, who is in trouble, having agreed to produce ecstasy for a dangerous man. Ferry agrees to help her. He takes the RV with his niece to meet the men who she agreed to work for, finding that a man who had betrayed him to the police was also working with the gang. He does not like this, but he then takes the RV to pick up his old drug-making equipment. He links up with several of his nieces' friends in the Netherlands and they proceed to attempt to complete the pill order. Meanwhile, the gang decides to kill them rather than paying them, but Ferry discovers this, and hires the contract killer to murder the gang's leader instead. Eventually, the double crossing leads to a shootout and several killings, but Ferry's niece gets away and Ferry is left, potentially dead, on a park bench.

105.    Prior to the release of Plaintiff's book, neither *Undercover Season 1, Season 2,  Season 3, Ferry: the Series, nor Movie 1* ever depicted anything happening in Spain. It was only after the publication of Plaintiff's Copyrighted Material, *Drugsbaron*, in which Plaintiff's Adrianus Van Wesenbeeck makes extensive use of a recreational vehicle (RVs) to traffic drugs through Spain, that Spain appears in a Ferry film. (*See* Screenshots below, from "*Ferry 2*" and Exerpts from "*Drugsbaron,*" both in Dutch and in English machine translation).





"Those three didn't know anything about anything," John explains. "That works best. If no one knows anything, they can't nervous either. We drove south in a beautiful motor home. Everything was on board: kitchen, toilet, shower, storage cabinets and nice beds. In Morocco had a great time. Toward the end of that vacation, I

n_4edruk.99                    ⊕                    07/06/2024 (

**90**                                             **Drug Baron**

the stuff on my own. I checked that everything was neatly hidden. Nothing to see, nothing to smell. At the Moroccan port for the boat to Spain, I had to show my papers and turn in a card to make the crossing. It had been hot for weeks, but that day was really terribly hot - or maybe



Het verhaal begint gezellig: John Zwart neemt Helen en haar twee kinde-
ren mee op vakantie naar Marokko.

   "Die drie wisten nergens iets van af," vertelt John. "Dat werkt het
beste. Als niemand iets weet, kunnen ze ook niet nerveus zijn. We reden
in een prachtige camper naar het zuiden. Alles zat aan boord: keuken,
toilet, douche, opbergkasten en lekkere bedden. In Marokko hadden
we het enorm naar ons zin. Tegen het einde van die vakantie haalde ik

Drugsbaron_4edruk.indd  89          ⊕          07/06/2024  09:08

**90**                              Drugsbaron

het spul in mijn eentje op. Ik controleerde dat alles netjes verstopt was.
Niets te zien, niets te ruiken. Bij de Marokkaanse haven voor de boot
naar Spanje moest ik mijn papieren laten zien en een kaart inleveren om

106.    In the Copyrighted Material, after trafficking marijuana through Spain, Plaintiff Adrianus Van Wesenbeeck purchased a luxury RV to take his family on vacation in Spain. (*See*, Exerpts from "*Drugsbaron,*" below, both in Dutch and in English machine translation.)

107.     While he was there, he tried to be "unreachable" in order to pay his family back for the time he was in jail. Similarly, while he is in the RV park in Spain, his niece mentions that she had a hard time finding him, as no one knew where he was. He then mentions "paying her back" for the time he had missed when she was in jail. This distinctive narrative element, first introduced by Plaintiff's Copyrighted Material, reappears in *Ferry Movie 2*, where NETFLIX depicts the character Ferry Bouman living in an RV by the Mediterranean Sea in Spain and later driving it back to the Netherlands in order to restart his drug trafficking operation. *In Season 1, Season 2, Season 3, Ferry: the Series, and Movie 1,* Ferry never took his family to Spain, or anywhere else on a family vacation in RVs. The replication of this specific and thematically significant plot device constitutes one of the most striking similarities between the two works.  (*See* Screenshots below, from "*Ferry 2*" and Exerpts from "*Drugsbaron,*" both in Dutch and in English machine translation).









For Janus, vacations with the family are especially sacred. "I had a

**Belgium**          **187**

bought a super deluxe camper van with all the trimmings. We went to Spain with it for six weeks. Then I really tried to be unreachable for anyone who was looking for me. Because if I had a phone with me or if they knew where I was, it was over. Then they flew over to talk to me."

But wasn't the point precisely to stay under the radar and not go too crazy, especially financially? "I didn't act crazy either, but I did want to spoil my family. That's how I tried to buy off my absence due to my work and those years in prison."

De rest van het gezin wordt niet vergeten. "Ik nam regelmatig een kleinigheidje voor iedereen mee, laat ik het zo zeggen."

Voor Janus zijn vooral de vakanties met het gezin heilig. "Ik had een

**België**          **187**

superdeluxe camper gekocht met alles erop en eraan. Daarmee gingen we zes weken naar Spanje met z'n allen. Dan probeerde ik echt onbereik-baar te zijn voor iedereen die me zocht. Want als ik een telefoon bij me had of als ze wisten waar ik zat, dan was het over. Dan vlogen ze naar me toe om met me te praten."

Maar was het niet juist de bedoeling om onder de radar te blijven en niet te gek te doen, zeker niet financieel? "Ik deed ook niet gek, maar ik wilde wel mijn gezin verwennen. Zo probeerde ik mijn afwezigheid door mijn werk en die jaren gevangenis af te kopen."

108.    Third, Plaintiff never spoke Spanish in any of the works released prior to the *Ferry Movie 2*. In *Drugsbaron*, Ferry is shown as picking up languages easily, and takes Spanish lessons

while in jail. In *Movie 2*, after Ferry's release from prison, Ferry inexplicably speaks somewhat poor Spanish, and goes by "Andre," while living in Spain. The Plaintiff's linguistic abilities and knowledge of Spanish were not public knowledge prior to the release of *Drugsbaron*. This similarity is both striking and could not have come from anywhere but the Plaintiff's Copyrighted Material. (*See* Screenshots below, from "*Ferry 2*" and Exerpts from "*Drugsbaron,*" both in Dutch and in English machine translation).

109.     The recurrence of this highly specific and thematically integral narrative detail—used in the same criminal underworld context, along the same trafficking routes, and involving similar character motivations and personality traits—is evidence of the fact that NETFLIX had access to, and followed, Plaintiff's Copyrighted Material when developing *Movie 2*.



In Hasselt, a psychiatrist regularly visited Janus. "He took one look at me and then said to the management, 'Allee, he's not crazy yet, though.' Then he was gone again. But that long solitary confinement does something to a person. There was a plant in my cell, and at one point I saw it move. As if there was wind. It wasn't, but I could swear I saw it."

Janus later talks about it with Lydia and she tells him to keep his brain going. "I then read the book *Portrait in Sepia* by Isabel Allende," he says.

He also wants to take a Spanish course, but that is initially refused by the direc- tion of the Hasselt prison. "They said that otherwise I would start dealing cocaine. I laughed and said that's exactly what I was inside for! That management was terrible, but the keepers in Hasselt were super. They helped me wherever they could and were always nice. They called me 'Robocop' there, by the way, because I was still sitting with that metal rack."

Eventually, he did get permission to take the Spanish course and, two years after his arrest, his right arm was declared healed. "That scaffold was finally allowed to come off," he said.

\* \* \*

> In Hasselt komt regelmatig een psychiater bij Janus langs. "Die keek even naar me en zei dan tegen de directie: 'Allee, hij is nog niet zot, hoor.' Daarna was ie weer weg. Maar zo lang eenzame opsluiting doet wel wat met een mens. Er stond een plant in mijn cel, die zag ik op een gegeven moment bewegen. Alsof er wind was. Dat was niet zo, maar ik zou zweren dat ik 't zag."
>
> Janus praat er later over met Lydia en zij zegt dat hij zijn hersenen aan de gang moet houden. "Ik heb toen het boek *Portret in sepia* van Isabel Allende gelezen."
>
> Hij wil ook een cursus Spaans volgen, maar dat wordt door de directie van de Hasseltse gevangenis in eerste instantie geweigerd. "Ze zeiden dat ik anders in cocaïne zou gaan handelen. Ik moest lachen en zei dat ik daarvoor juist binnen zat! Die directie was verschrikkelijk, maar de bewaarders in Hasselt waren super. Ze hielpen me waar ze konden en waren altijd aardig. Ze noemden me daar trouwens 'Robocop', omdat ik nog steeds met die metalen stellage zat."
>
> Uiteindelijk krijgt hij toch toestemming voor de cursus Spaans en wordt zijn rechterarm, twee jaar na zijn arrestatie, genezen verklaard. "Die stellage mocht er eindelijk af."

110.     The strikingly parallel depiction of Ferry Bouman's lifestyle and activities involving an RV in Spain - first appearing in *Movie 2* after the release of Plaintiff's book *Drugsbaron*- is neither incidental nor coincidental and could only have been derived from Plaintiff's book, *Drugsbaron*.

111.     Furthermore, in *Movie 2*, Ferry Bouman is depicted dressing up as Santa Claus at the Spanish RV park where he is residing, engaging in pranks and playful antics with children. A similar detail is also found in *Drugsbaron*, where Adrianus Van Wesenbeeck recounts his time at the Dutch park between 2005 and 2009, including his fondness for dressing up and pulling

pranks in similar fashion. (*See* Screenshots below, from "*Ferry 2*" and Exerpts from "*Drugsbaron,*" both in Dutch and in English machine translation).

112.   Notably, Ferry Bouman exhibited no such behavior in the original NETFLIX series installments but began doing so for the first time in the December 2024 *Ferry, Movie 2* release — well after the March 2024 publication of *Drugsbaron*.



Janus is not averse to a joke at times. In addition to his barbecues where-when everyone fills up and food abounds, he regularly dresses up. "I like that." Legendary is his self-circulated story that a pencil pusher was spotted at the campground. "I told everyone that in the afternoon. In the evening I had painted myself up, put on weird glasses and put on a long coat with a fake cock underneath. I scared all my friends by suddenly jumping out and pulling open my coat. Gewel- dig!"

Picking up a CD of Islamic sermons, he held an "Islamic wake-up call. "After a whole night of boozing, I was absolutely wasted. At six in the morning I put the CD . I had a speaker that could play so loud - it was unimaginable. Early in the morning the Islamic Friday prayer resounded all over the campsite. John and Epke were furious!"

Between the costume parties and the practical jokes, more serious matters also take place. Like the meeting with the Amsterdam criminal

Janus is niet vies van een geintje op z'n tijd. Naast zijn barbecues waar-bij iedereen zich laat vollopen en er eten in overvloed is, verkleedt hij zich regelmatig. "Ik vind dat leuk." Legendarisch is zijn zelf in omloop gebrachte verhaal dat er een potloodventer is gesignaleerd op de camping. "Dat vertelde ik in de middag aan iedereen. In de avond had ik me geschminkt, een raar brilletje opgedaan en trok ik een lange jas aan met een neplul daaronder. Joeg ik al mijn vrienden de stuipen op het lijf door ineens tevoorschijn te springen en mijn jas open te trekken. Gewel-dig!"

Als hij een cd'tje met islamitische preken op de kop tikt, houdt hij een 'islamitische wekservice'. "Na een hele nacht zuipen was ik keizat. Zette ik om zes uur in de ochtend dat cd'tje op. Ik had een speaker die zó hard kon – dat was onvoorstelbaar. Klonk over de hele camping in alle vroegte het islamitische vrijdaggebed. John en Epke waren woedend!"

Tussen de verkleedpartijen en de practical jokes door vinden er ook seri-euzere zaken plaats. Zoals de ontmoeting met de Amsterdamse crimi-

113. These narrative parallels, particularly the idiosyncratic use of an RV lifestyle in Spain and campsite pranks involving dressing up as Santa Claus, are unique and complex enough to render the similarities between *Drugsbaron* and *Movie 2* striking. The specificity and sequencing of

these elements preclude the possibility of coincidence, independent creation, or reliance on a common source.

114.   The same may be said of other aspects of the film, which are set out in red font in Exhibit F.

115.   As a direct and proximate result of Defendants' unauthorized reproduction, public performance, and distribution of Plaintiff's Copyrighted Material, Plaintiff has suffered and continues to suffer significant economic, reputational, and personal harm.

116.   Plaintiff's injuries include, but are not limited to:

> (a) lost income and licensing fees;
>
> (b) loss of market value of the Copyrighted Material;
>
> (c) harm to reputation and goodwill;
>
> (d) dilution of the Copyrighted Material's value; and
>
> (e) Plaintiff being forced to vacate his home due to the financial, reputational, and professional consequences directly resulting from Defendants' infringing conduct.

117.   Plaintiff alleges that NETFLIX's conduct was knowing, intentional, willful, and in conscious disregard of Plaintiff's exclusive rights, and NETFLIX continues to infringe Plaintiff's copyright by streaming and distributing *Movie 2* globally without license or legal entitlement.

118.   Without authorization, permission, or consent from Plaintiff, NETFLIX continues to publicly perform, display, and distribute *Movie 2* to its global subscriber base, in violation of Plaintiff's exclusive rights under 17 U.S.C. § 106.

119.   As a result of NETFLIX's unlawful conduct, Plaintiff is entitled to an award of actual damages, costs, and profits attributable to the infringement, or alternatively; statutory damages

pursuant to 17 U.S.C. § 504(c), and 17 U.S. Code § 505 in an amount exceeding $166,000,000.00.

120.     Plaintiff also seeks injunctive relief, attorneys' fees, and costs pursuant to 17 U.S.C. § 502.

## NETFLIX'S UNLAWFUL CONDUCT

121.     NETFLIX has engaged, and continues to engage, in a pattern and practice of knowingly, intentionally, and willfully infringing Plaintiff's copyright, and otherwise violating Plaintiff's exclusive rights under the Copyright Act.

122.     At no time did Plaintiff license, authorize, permit, or consent to NETFLIX reproducing, adapting, distributing, publicly displaying, or publicly performing any of Plaintiff's Copyrighted Material in any film, television series, or other medium.

123.     Nevertheless, NETFLIX has produced, reproduced, made, streamed, and/or distributed, and continues to stream and distribute, an unauthorized adaptation of Plaintiff's Copyrighted Material in the form of *Movie 2*, making it available for public display and public performance around the clock every day via its global streaming platform and to its worldwide subscriber base.

124.     Without any authorization, permission, consent, or license from Plaintiff, NETFLIX publicly performs, publicly displays, and distributes this unauthorized adaptation of Plaintiff's Copyrighted Material to users of its website and streaming platform by making *Movie 2* available as part of NETFLIX's content library and programming, thereby infringing Plaintiff's exclusive rights under 17 U.S.C. § 106.

125.     Plaintiff alleges NETFLIX's infringing conduct was and continues to be willful, deliberate, intentional, and in conscious disregard of Plaintiff's exclusive rights.

126.    As a result of NETFLIX's unlawful conduct, Plaintiff is entitled to an award of actual damages and profits attributable to the infringement, or, in the alternative, statutory damages under 17 U.S.C. § 504(c), i, as well as injunctive relief, attorneys' fees, and costs pursuant to 17 U.S.C. § 505.

WHEREFORE Plaintiffs respectfully requests that this Court: Enter judgment in favor of Plaintiff on this Count; Award actual damages and profits attributable to the infringement, or alternatively, statutory damages under 17 U.S.C. § 504(c), in an amount exceeding $166,000,000.00; Enter injunctive relief prohibiting further distribution, display, public performance, and exploitation of *Ferry Movie 2*; Award Plaintiff reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505; and Grant such other and further relief as the Court deems just, proper and equitable in light of NETFLIX's unlawful conduct.

## II.      COUNT TWO DEFAMATION

127.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

128.    In order to prevail on a cause of action for defamation,  Plaintiff Adrianus Van Wesenbeeck must plead and ultimately prove five elements: (1) publication; (2) falsity; (3) actor must act at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). See also *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768-69, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986). In order to avoid a defamation claim, Florida law requires "that the publication shall be substantially true, and that mere inaccuracies, not affecting materially the purport of the article, are immaterial." *McCormick v. Miami Herald Publ'g Co.*, 139 So. 2d 197,

200 (Fla. 2d DCA 1962) (quoting 53 C.J.S. Libel and Slander §122); Ozyesilpinar v. Reach PLC, 365 So. 3d 453, 456 (Fla. 3d DCA 2023).

129.    Here, Defendant has knowingly, recklessly, and/or maliciously made and/or published false and defamatory statements maliciously critical of, or derogatory to, Plaintiff Adrianus Van Wesenbeeck and which is reasonably calculated to injure Plaintiff for their personal gain.

130.    Defendant continues to publish, oral or written statements, which are false or maliciously critical of, or derogatory and defamatory to Plaintiff Adrianus Van Wesenbeeck and which are reasonably calculated to injure and continue to injure Plaintiff Adrianus Van Wesenbeeck.

131.    Specifically, Defendant's publications have unjustly associated Plaintiff with criminal activity (being *inter alia,* a murderer and a human trafficker,) although he has never committed nor been charged with the crime of murder nor human trafficking.

132.    Defendant used the character of "Ferry Bouman" to make false statements about Plaintiff Adrianus Van Wesenbeeck.

133.    Particularly, Defendant knowingly and maliciously published false statements of fact portraying Plaintiff as having committed heinous crimes, including murder, serial murder and human trafficking since 2019, across *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2,* and continues today.

134.    These defamatory representations were and are entirely false and made with actual malice or, at a minimum, reckless disregard for the truth.

135.    In fact, Plaintiff's criminal record reflects conviction solely for drug trafficking, involvement in an international criminal organization, and money laundering - none of which approach the defamatory and injurious accusations of a murder, serial murder, or human trafficking falsely attributed to Plaintiff by Defendant.

136.    Thus, the statements are false, defamatory, unprivileged, and as a result–have harmed Plaintiff's reputation and caused him emotional distress.

137.    The Statements have caused Plaintiff to receive death threats.

138.    The statements have caused Plaintiff to lose his house.

139.    First, a reasonable person understands the statements about Plaintiff to be interpreted as assertions of fact. The statements made in *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2* clearly show that Ferry Bouman is based on the real-life crime boss Adrianus Van Wesenbeeck, a notorious drug dealer from the Netherlands. Titled: Who is Ferry Bouman based on, showing it is internationally known that this is the story of Plaintiff's life. [16]

---

[16]See Article from <u>Ready Steady Cut</u> "Who is the real-life drug lord behind Netflix kingpin Ferry Bouman?" <u>https://readysteadycut.com/2023/11/03/ferry-bouman-who-is-he-based-on/</u>



140.     Second, while *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2*
use some dramatic cinematic elements, these elements are not so absurd or surreal as to
neutralize the audience's expectations that they are watching the story of Plaintiff's life.

141.     Third, the statements are sufficiently factual to be susceptible of being proved true or
false. Whether Adrianus Van Wesenbeeck was convicted of Murder or Human Trafficking is a
provable assertion. Under the totality of the circumstances, a reasonable person could interpret
the statements to be assertions of fact.

142.     Moreover, this defamatory matter is "of and concerning" Plaintiff as he is easily identified as Ferry Bouman, which can be shown both by a simple Google search identifying Adrianus van W., also known as Janus van W., was the real-life inspiration for the character Ferry Bouman in *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2*. Additionally, there are over 200 similarities between the Plaintiff's life and the character of Ferry Bouman.

143.     The Defendant and/or the agents of the defendants had actual knowledge of the untrue nature of the statements made about Plaintiff Wesenbeek, and those statements are defamatory *per se*.

144.     The statements made by Defendant are substantially not true in that there is a major difference between being a convicted murderer, much less a serial murderer, or a human trafficker and actually just being convicted as a non-violent drug dealer or drug trafficker. The Plaintiff Wesenbeeck's actual Damages exceed  $10 million dollars.

WHEREFORE, Plaintiff, Wesenbeeck, Adrianus Van Wesenbeeck, individually and as Administrator of the Estate of Elly Adriana Janssen, respectfully requests judgment against Defendant for all remedies available under Florida Law including but not limited to, both actual loss and damages, costs, interest, royalties, and restitution of Defendant's unlawful proceeds, and punitive damages including Defendant's profits and other relief deemed just and fair.

### III.     COUNT THREE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED).

145.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

146.     Florida Courts "have held that the elements of intentional infliction are (1) intentional or reckless conduct (2) that is "outrageous" in that it is "beyond all bounds of decency" and "utterly intolerable in a civilized community" (3) and that causes the victim emotional distress (4) that is 'severe.'" *Kim v. Jung Hyun Chang*, 249 So.3d 1300.

147.     The exact definition of severe emotional distress is vague, but the intensity and duration of the distress are important factors. There must be a causal connection between the defendant's conduct and the victim's distress.

148.     Plaintiff Wesenbeeck asserts a claim for IIED, because Defendant intentionally or, at a minimum, recklessly engaged in extreme and outrageous conduct that has caused and continues to cause Plaintiff severe emotional distress.

149.     Specifically, Defendant made and widely disseminated false and defamatory statements portraying Plaintiff as a violent serial murderer and human trafficker in *Season 1, Season 2, Season 3, Ferry: the Series, Movie 1, and Movie 2.* These statements were either intended to cause Plaintiff emotional distress or, if not intentional, were made with reckless disregard for the inevitable harm they would cause.

150.      A reasonable viewer would clearly understand that the character Ferry Bouman was a depiction of Plaintiff, Adrianus Van Wesenbeeck.

151.     The nature of these statements – falsely accusing Plaintiff of the most heinous crimes imaginable — unquestionably constitutes extreme and outrageous conduct sufficient to sustain a claim for IIED.

152.     As a direct consequence of Defendant NETFLIX's false and defamatory portrayal of the character Ferry Bouman — who is unmistakably based on Plaintiff Adrianus Van Wesenbeeck — as a murderer, serial murderer, human trafficker, and perpetrator of heinous crimes, Plaintiff has

been subjected to ongoing death threats and credible threats of violence. These threats are a foreseeable result of Defendant's reckless publication and international distribution of these false narratives, specifically that the Movies and Series portrayed *Ferry* as a police informant, leading to death threats being made by former associates of Plaintiff towards the Plaintiff, which have caused Plaintiff severe emotional distress, irreparable harm to his reputation, and placed his personal safety in immediate jeopardy.

153.    Moreover, as a direct result of Defendant's intentionally inflicted actions against Plaintiff Wesenbeeck, Plaintiff Wesenbeeck has suffered anxiety, nightmares, panic attacks, paranoia, shame, depression, nervousness, and abdominal pain not only due to actions against him but also due to the mocking of his late wife's death when promoting *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2* through The Promotional Song, including through comments by NETFLIX's official account on NETFLIX's official Facebook page.

154.    Here, *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2* are each and collectively viewed as true even if Defendant switches out the real name of Plaintiff Wesenbeeck for a character name, 'Ferry Bouman.' It is internationally known that the character of Ferry Bouman is based on Adrianus Van Wesenbeeck. As shown on the front page of a web-based Google search, Ferry: The Series is based on Plaintiff's life story.



155.    A reasonable viewer could understand the statements about 'Ferry Bouman' to be about

Plaintiff Wesenbeeck and these statements rise to the level of extreme and outrageous conduct.

156.     Accordingly, Plaintiff Wesenbeeck has been seriously damaged mentally and emotionally. Said damages, which shall be determined at trial, are believed to exceed $20 million dollars, exclusive of legal fees, costs, and statutory interest.

WHEREFORE, Plaintiff, Wesenbeeck, Adrianus Van Wesenbeeck, individually and as Administrator of the Estate of Elly Adriana Janssen, respectfully requests judgment against Defendant for all remedies available under Florida Law including but not limited to, both actual loss and damages, costs, interest, royalties, and restitution of Defendant's unlawful proceeds, and punitive damages including Defendant's profits and other relief deemed just and fair.

## IV.     COUNT FOUR: RIGHT TO PUBLICITY, OR IN THE ALTERNATIVE, INVASION OF PRIVACY.

157.     Plaintiff Wesenbeeck realleges each of the aforementioned allegations as if fully alleged herein.

158.     Plaintiff Wesenbeeck and his deceased wife have a statutory right of publicity under Section 540.08, Florida Statutes. Section 540.08, Florida Statutes, provides that: "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use."

159.     Under Florida Law, a surviving spouse may bring a publicity action on behalf of his or her deceased spouse. *Fla. Stat.* § 540.08(1)(c).

160.     Despite the clear language of Section 540.08, Defendant published Plaintiff Wesenbeeck's and Decedent's image, personality, likeness and/or identity in *Season 1, Season 2, Season 3, Ferry: the Series, Movie 1, and Movie 2,* including in the Promotional Song.

Defendant never sought permission nor authority to use Plaintiff Wesenbeeck's image, likeness, personality and/or identity to advertise, promote, market, or endorse *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2,* including its Promotional Song.

161.    Plaintiff Wesenbeeck never consented to, permitted, assigned, licensed, or otherwise agreed to Defendant's use of his personality,  image, likeness, personality and/or identity to advertise, promote, market, or endorse *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2* including its Promotional Song.

162.    Defendant's promotion for the new movie Ferry 2, and song "King of the Camping." The words of the song state:

163.    "Ik ben de king, king, king van de camping. Ik ben de king king king, er is bier voor iedereen. Ik ben de king, king, king van de camping. Maar wat is een koning zonder koningin?"

164.    Meaning: I am the king, king, king of the campsite. I'm the king king king, there's beer for everyone. I am the king, king, king of the campsite. But what is a king without a queen?

165.    The derogatory sentence in the song Defendant published and is promoting attached to the *Ferry 2 Movie* is about Plaintiff Wesenbeeck and his wife, Lydia who died in 2015 of cancer. *See* paragraph 32-33, supra demonstrating Defendant's use of Plaintiff Wesenbeeck's  image, likeness, personality and/or identity to advertise, promote, market, or endorse *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2* including its promotional song, even though Defendant never sought permission nor authority to use Plaintiff Wesenbeeck's  image, likeness, personality and/or identity to advertise, promote, market, or endorse *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2* including its promotional song.





166.    Defendant's promotional song advertised, marketed and promoted on its Facebook page is not the only instance where Defendant used Plaintiff Wesenbeeck's and/or Decedent's image, likeness and/or identity to advertise, promote, market, or endorse *Season 1, Season 2,  Season 3, Ferry: the Series, Movie 1, and Movie 2.*

167.    It is implausible that Defendant did not use Plaintiff Wesenbeeck's and/or Decedent's image, likeness, personality and/or identity to advertise, promote, market, or endorse *Season 1, Season 2, Season 3, Ferry: the Series, Movie 1, and Movie 2* when there is no other male from Southeast Brabant, who operates in the international drug trade from a camping site where undercover agents infiltrate a drug kingpin's operation in Limburg, a Flemish province bordering the Netherlands and who bears an uncanny resemblance to 'Ferry Bouman' other than Plaintiff Wesenbeeck.

168.    Moreover, actor Frank Lammers, who portrays Ferry Bouman, has publicly admitted—both in an interview on an American podcast and in a direct conversation with

Plaintiff Wesenbeeck in front of several journalists—that the character is based on no other than Plaintiff Wesenbeeck. Defendant's use Plaintiff's image, likeness and/or identity to advertise, promote, market, or endorse S*eason 1, Season 2, Season 3, Ferry: the Series, Movie 1, and Movie 2*, ultimately eliminating the possibility that Defendant did not use Plaintiff Wesenbeeck's image, likeness, personality and/or identity to advertise, promote, market, or endorse *Season 1, Season 2, Season 3, Ferry: the Series, Movie 1, and Movie 2.*

169.    Since the release of TV series Undercover back in 2019, members of the public have identified Adrianus Van Wesenbeeck as "Ferry Bouman." The identification of Adrianus Van Wesenbeeck as 'Ferry Bouman' was easy as Adrianus Van Wesenbeeck's identity was completely undisguised. Moreover, since before the release of the Season 1, Season 2, Season 3, etc., newspaper articles and other publications have consistently identified Adrianus Van Wesenbeek as the subject of all four series and two movies.

170.    Defendant intentionally or, at a minimum, recklessly published, printed, displayed, or otherwise publicly disseminated or used, and continues to use, Plaintiff Wesenbeeck and/or Decedant's image, likeness, personality and/or identity without his or her express written or oral consent, for purposes of trade or for other commercial or advertising purposes as detailed above. It is known worldwide whose  image, likeness, personality and/or identity Defendant used and continues to use to advertise, promote, market, or endorse *Season 1, Season 2, Season 3, Ferry: the Series, Movie 1, and Movie 2,* including its Promotional Song.

171.    Defendant has been unjustly enriched by the misappropriation of the Plaintiffs' name, image, likeness, personality and/or identity.

172.    Defendant had and continues to have actual or constructive knowledge of the wrongfulness of its conduct and acted with intent or with reckless disregard to deprive Plaintiff

Wesenbeeck of a property interest during the entire time-period in which the unauthorized use took place and continues to take place.

173.   At a minimum, Defendant's conduct was so reckless or wanton in care that it constituted a conscious disregard of or indifference to Plaintiff Wesenbeeck's rights. Alternatively, Defendant acted negligently towards Plaintiff Wesenbeeck, in using and disseminating, without authority, Plaintiff Wesenbeecks' image, likeness, personality and/or identity in multiple series and movies, on the Internet and otherwise, in order to promote, advertise and market, *Season 1, Season 2, Season 3, Ferry: the Series, Movie 1, and Movie 2,* including its Promotional Song.

174.   Defendant has caused and will continue to cause damage to Plaintiff, as a direct and proximate result of its unauthorized use of Plaintiff's image, likeness, personality and/or identity without compensating Plaintiff Wesenbeeck, knowing that Defendant would stand to gain by using his identity.

175.   Accordingly, Plaintiff Wesenbeeck and his late wife have been seriously damaged. Said damages, which shall be determined at trial, are believed to exceed $30 million dollars, exclusive of legal fees, costs, and statutory interest. In addition, because Defendants' conduct was so outrageous, Plaintiff Wesenbeeck seeks punitive damages in an amount that will punish Defendants from ever engaging in said conduct and deprive them of all benefit, financial or otherwise, of their outrageous conduct.

   WHEREFORE, Plaintiff, Wesenbeeck, Adrianus Van Wesenbeeck, individually and as Administrator of the Estate of Elly Adriana Janssen, respectfully requests judgment against Defendant for all remedies available under Florida Law including but not limited to, both actual loss and damages, costs, interest, royalties, and restitution of Defendant's unlawful proceeds, and punitive damages including Defendant's profits and other relief deemed just and fair.

## EXEMPLARY DAMAGES

176.    The acts complained of herein and in the preceding paragraphs above were done willfully, unlawfully, maliciously, and in wanton disregard of the rights and feelings of Plaintiff Wesenbeeck, and by reason thereof, he now demands punitive and compensatory damages.

## JURY DEMAND

177.    Plaintiff Wesenbeeck requests a trial by jury on all claims.

## PRESERVATION NOTICE

178.    Plaintiff Wesenbeeck requests that Defendants preserve any and all related evidence, reports, statements, notes, emails, text messages, communications, concerning the allegations herein. Defendants' failure to preserve relevant evidence may warrant a spoliation instruction at trial, which creates a presumption that if the evidence was preserved, it would weigh against the respective party.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Wesenbeeck, Adrianus Van Wesenbeeck, individually and as Administrator of the Estate of Elly Adriana Janssen requests that Defendant, NETFLIX, be cited to appear and answer, and that at the final trial of this matter, Plaintiff Wesenbeeck have judgment against Defendants, as follows: (I) Judgment against Defendants for actual damages, the sum to be determined at trial, but is believed to exceed $26 million dollars, exclusive of legal fees, costs, and statutory interest; (II) Judgment against Defendants for compensatory damages in the maximum amount allowed by law, in an amount to exceed $50 million dollars, exclusive of legal fees and costs, including mental anguish, loss of enjoyment of life, and loss of business; (III) Judgment against Defendants for all profits from : *(1) Season 1, Season 2, and Season 3 (2) Ferry: The Series;  (3) Movie 1 and (4) Movie 2,* in maximum amount allowed by law, in an

amount to exceed $166 million dollars, exclusive of legal fees and costs; (IV) Judgment against Defendants for punitive damages in the maximum amount allowed under law, and believed to exceed $50 million dollars;  (V) Pre-judgment interest at the legally prescribed rate from the date of the violations until judgment as well as post-judgment interest as applicable; (VI) An award of attorneys' fees; (VII) For preliminary and permanent injunctive relief enjoining Defendants, and all persons acting in concert or participation with Defendants, from further infringing Plaintiff's copyright in the Copyrighted Material pursuant to 17 U.S.C. § 502;  and (IIX) Such other general relief to Plaintiff Wesenbeeck as the court deems just and proper.

Respectfully Submitted

_____

*Elysa Galloway, Esq.*
Florida Bar #117045
Law Offices of Elysa Galloway
PO Box 5131
Lighthouse Point, FL 33074-5131
Office: 954-998-3828
gallowayatlaw@gmail.com

*Noel Christian Pace, Esq.*
Florida Bar# 1017065
The Law Offices of Noel C. Pace, PLLC
8661 NE 2nd Ave.
El Portal, FL 33138
Office: (305) 219-1191
noel.c.pace.esq@gmail.com

Dated: May 27, 2025

Miami Dade County, Florida